NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 250399-U

NO. 4-25-0399

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 16, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| JUSTIN ARMSTEAD; MARY A. BART, JOAN M. BEEMAN and BRUCE A. BEEMAN; MARIA M. DELBECCARO and JAMES M. GILCHRIST; SUSAN A. FARR; BRUCE A. JOHNSON and JEROLENE S. JOHNSON; JAMES R. KELLER and JUDITH L. KELLER; KEVIN L. KUHN and COLLEEN KUHN; JOHN R. LINK, as Trustee, and KATHLEEN A. LINK, as Trustee; MARK D. MILLER and TAMERA L. MILLER; EDWARD E. OSMAN and DIANE OSMAN; DOROTHY H. WIRE TRUST; and ANDREW J. YUSKANICH and CASEY R. JACOBS, | ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Sangamon County No. 17TX001/003 |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) | Honorable |
| THE SANGAMON COUNTY COLLECTOR, | ) | John M. Madonia, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Presiding Justice Steigmann concurred in the judgment.
Justice Doherty dissented.

**ORDER**

¶ 1    *Held*: The appellate court reversed, finding plaintiffs failed to prove that the use of two different land valuation formulas violated the uniformity clause of the Illinois Constitution (Ill. Const. Art. IX, § 4 (West 2024)) because they presented no evidence that the two formulas resulted in them paying taxes on a different proportion of their properties' fair cash value.

¶ 2    Plaintiffs, Justin Armstead; Mary A. Bart, Joan M. and Bruce A. Beeman; Maria

M. Delbeccaro and James Gilchrist; Susan A. Farr; Bruce A. and Jerolene S. Johnson; James R.

and Judith L. Keller; Kevin L. and Colleen Kuhn; John R. and Kathleen A. Link, as trustees; Mark

D. and Tamera L. Miller; Edward E. and Diane Osman; the Dorothy H. Wire Trust; and Andrew

J. Yuskanich and Casey R. Jacobs, owners of 13 homes located on the shoreline of Lake Springfield in Springfield, Illinois, filed a tax objection complaint in the circuit court of Sangamon County, asserting that their 2016 property taxes violated the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, § 4(a)). The trial court agreed with plaintiffs and awarded them partial refunds of their 2016 property taxes. Defendant, the Sangamon County Collector, now appeals, arguing that plaintiffs failed to establish a uniformity clause violation.

¶ 3        We agree with defendant and reverse.

¶ 4                                    I. BACKGROUND

¶ 5        The shoreline of Lake Springfield is divided into lots and leased out to various individuals by the City of Springfield. Some of these lakefront lots contain single-family residential dwellings, while others are occupied by nonprofit recreational clubs. Plaintiffs in the instant case were the owners of 13 lakefront residential properties. They leased the land on which their homes were located from the City of Springfield. All were responsible for paying property taxes on their leased premises.

¶ 6        Between September 2016 and January 2017, each plaintiff filed a complaint with the Sangamon County Board of Review regarding their 2016 property taxes. Each complaint asserted that the named plaintiff's lakefront property had not been "assessed in a uniform manner, resulting in an unequal, unfair, and illegal assessment." From the record on appeal, it appears that a hearing was held on these complaints. Although the precise outcome of the hearing is unclear, it can be assumed that plaintiffs did not receive the result they wished, because on September 15, 2017, they filed a joint tax objection complaint in the circuit court of Sangamon County, repeating their claims that their properties were not taxed uniformly with other lakefront properties. Specifically, they alleged that certain recreational clubs on the shore of Lake Springfield (namely,

the Springfield Ski & Boat Club, the Prop Club, the Island Bay Yacht Club, the Blue Ridge Club, the Sangamo Surf Club, the Springfield Motor Boat Club, and the Anchor Boat Club) were assessed at an amount "far below" what they would have been had they been valued using the same formula that was used to value plaintiffs' properties. Plaintiffs alleged that because Sangamon County used different formulas, plaintiffs paid a larger proportion of their properties' value in taxes compared to the recreational clubs.

¶ 7        On February 7, 2019, plaintiffs moved for summary judgment, arguing that the material facts of the case were not in dispute and supported their claim that the taxes imposed on the Lake Springfield properties were not uniform. In a responsive motion, defendant argued, in part, that plaintiffs had failed to present evidence of property that was comparable to their property in order to show a lack of uniformity in taxation. Defendant specifically asserted that owing to their use, the recreational club lots were not similar in kind and character to plaintiffs' residential lots. The trial court agreed with defendant and denied plaintiffs' motion, finding that a material factual dispute existed as to whether the properties at issue in plaintiffs' complaint were " 'like' " or " 'comparable' " for tax assessment purposes based on their "undeniably *** different uses."

¶ 8        On July 18, 2019, plaintiffs filed a motion to amend their complaint, which was granted. Plaintiffs' amended complaint repeated their claims regarding nonuniformity in the taxation of their lakefront properties and asserted that, since filing their original complaint, it had been discovered that the lower valuation of the recreational club lots was "not the result of a mistake or some unofficial action of [rogue] assessors, but [was] instead the intentional and designed result of a separate and far lower assessment formula" being used for the recreational lots. In the motion to amend their complaint, plaintiffs also clarified that "the sole issue" in the case was whether "the use of totally different 'commercial' and 'residential' formulas" violated

the uniformity clause of the Illinois constitution. Plaintiffs stated they wished to "make it as clear as possible in the pleadings that the issue in this case [was] not and ha[d] never been whether the assessments of any of the lots referenced in the complaint [were] correct or incorrect or [were] overvalued or undervalued."

¶ 9 A bench trial was held on August 9, 2024. The trial consisted solely of the parties entering stipulated exhibits into evidence. The following information is taken from these exhibits.

¶ 10 Plaintiffs' lakefront lots ranged in size from 0.16 acres to 2.16 acres. Each lot was governed by a lease that ran with the land and expressly permitted plaintiffs to build and occupy a single-family home on the premises. Plaintiffs' leases did not allow for the building of a recreational or social club on their lots.

¶ 11 The recreational club properties were all leased to nonprofit corporations organized for the purpose of operating private social and boating clubs. The lots ranged in size from 5.03 acres to 8.98 acres. Each was governed by a lease that ran with the land. The leases of the Prop Club, the Anchor Boat Club, the Sangamo Surf Club, and the Springfield Water Ski & Boat Club allowed the land to be used only for the recreation of the club's members, their families, and their guests. Similarly, the leases of the Island Bay Yacht Club and the Springfield Motor Boat Club provided that the land was to be used solely for the recreational and social purposes of the clubs. All of the lake club lot leases permitted the construction of a clubhouse, dock, and further "appurtenant improvements" on the premises to meet the recreational needs of the custodian's members and guests. Additionally, the leases for all the clubs lots except for the Blue Ridge Club provided that only the "caretaker" of the specific recreational club was permitted to reside on the premises with his or her family. The Blue Ridge Club lease was the only one to allow for the building of a single dwelling house on the premises. All of the lake club leases except for the Blue

Ridge Club lease prohibited any business or trade from being conducted on the premises but allowed the custodian club to furnish its guests with food and refreshments.

¶ 12    All of the lakefront properties at issue were given the tax classification of "Non-Farm Land" and were required to be assessed at 33.333% of their fair cash value (FCV). The tax assessments for nonfarm properties consisted of two parts. First, the value of the land itself was assessed. Then, the value of any buildings on the property was assessed. The two assessments were then combined to arrive at the final assessment of a property. This figure was then used to calculate the property's annual property tax.

¶ 13    Two different mathematical formulas were used to calculate the land valuation for lakefront lots that were deemed "residential" and those that were deemed "commercial." The residential formula took into account the location of the lot, the number of feet of lake frontage the lot had, and the total square feet of the lot. In contrast, the formula used to value the recreational clubs' land was based solely on the square footage of the lot. These formulas were the exclusive method of arriving at the value of each property's land.

¶ 14    Plaintiffs presented calculations showing that, had their land been valued using the same formulas as the recreational club lots, their overall property taxes would have decreased by amounts ranging from $2,463 to $4,725.

¶ 15    In a discovery deposition, Larry McCarthy, the chief deputy assessor of Capital Township, testified that the two different formulas used to assess the lots' land were based on the different lots having different kinds of improvements on them, which affected their value. However, when asked for the basis for his assertion that the lots had two different values, he responded that he had no basis, stating, "I didn't make the formula so, you know."

¶ 16    Carol Von Lanken, the Woodside Township assessor, testified in her deposition

that the designation of properties on Lake Springfield as "residential" or "commercial" came from the Sangamon County assessor's office. She did not know who created the formulas, what information was used to create them, or when they were adopted. She stated that she did not know why the formulas differed between residential and commercial lots. She also testified that land assessments were calculated independently of any building constructed on the land. In other words, when land was assessed, it was treated as a vacant lot, and its value was calculated irrespective of its use.

¶ 17      Byron Deaner, the Sangamon County supervisor of assessments, testified that both property deemed residential and property deemed commercial were assessed at 33 ⅓% of their FCV. However, he stated that, between residential and commercial properties, "[h]ow you get to that valuation is a slightly different process." He testified that he did not know what information was used to create the two different formulas for assessing the land or when the formulas were adopted. When asked how he then could know that lots labeled as "commercial" were less valuable than lots labeled "residential," he responded that valuations were based upon use, stating, "[I]t's hard to say that they all should be valued the same. A residential use and a commercial use are two totally different uses." He explained that when arriving at the formulas, sales of similar properties throughout the neighborhood were studied and compared. He stated that the Illinois Department of Revenue compared the market values of properties on Lake Springfield to their assessed values and this information was then given to the assessor's office. Deaner further testified that the zoning classification of property did not determine its value, so a property being used for commercial purposes would not necessarily have the same value as a property being used for residential purposes, although both were technically zoned residential. He also stated that it was very possible for a property designated as commercial to be worth less than a same-size parcel that was

designated as residential.

¶ 18 John Christopher Gregurich, the Ball Township assessor in Sangamon County, testified in his deposition that land was assessed separately from any buildings on the land and that, in theory, a vacant one-acre lot on Lake Springfield should be worth the same as another vacant one-acre lot, regardless of any buildings built thereon, provided they were in the same location. However, he then stated that when valuing a property's land, he took into consideration the current use of the lot and his valuation would be different if a lot had a residential home versus, for instance, a factory on it. When asked to clarify his seemingly inconsistent statements, Gregurich replied, "I misunderstood the question as far as determining the value of the land. An industrial park would be different than a residential, and that's why I said—That's why I said yes, that would be different." He again agreed that lot valuations were made as though the lots were vacant without elaborating on the discrepancy.

¶ 19 Gregurich further testified that in Cook County, property was classified and taxed at different rates. Although Sangamon County "classified" certain property as "residential" and certain other property as "commercial," he understood the word "classification" to be used differently with respect to the Sangamon County properties. He explained that while properties in Cook County may be classified and taxed at different rates, properties in Sangamon County could be classified as either "commercial" or "residential" and still be taxed at the same rate of 33 ⅓% of the properties' FCV.

¶ 20 Charles Johnson, an expert in real estate appraisal, submitted an opinion on behalf of plaintiffs. He opined that the club lots and the plaintiffs' residential lots were " 'like kind' " and "similarly situated." He noted that all of the club leases permitted a single-family residence to be built and occupied on the lot. Further, while all of the club leases permitted a recreational club to

be built, they did not command it. Johnson stated that nothing prevented a private party from purchasing a lake club, remodeling it for use as a single-family home, or tearing it down and constructing a single-family home in its place. He noted that all of the lots at issue were zoned residential and not commercial and that all of the club lots' leases prohibited any commercial activities from occurring on the properties.

¶ 21 In Johnson's opinion, the "commercial" designation that had been placed on the recreational club lots had no justification or basis. He noted that any difference related to the use of the lots should be expressed in the valuation of the properties' buildings, not in the land value computation. He concluded, "Considering only the lake lots themselves[,] the lake lots of the plaintiffs and the lake lots of the Clubs are similar in kind and character, are 'like kind,' and are similarly situated to each other."

¶ 22 After all the evidence was admitted, the trial court took the matter under advisement. It ordered both parties to submit memoranda in support of their positions.

¶ 23 On December 19, 2024, the trial court entered judgment in favor of plaintiffs. It found that the lake club lots and the plaintiffs' lots were "like" properties that should have been subjected to the same taxing basis, but were not, under defendant's taxing scheme. It explained that "[w]hen evaluating and assessing these non-farm land, lakefront lots, without considering improvements, which both the assessors and plaintiffs' expert testified was the appropriate way to fairly value the land-only portion of the property ***, it is clear the lots are remarkably similar in characteristics." It noted that all of the lots were located on the main body of the lake, designated nonfarm land for taxing purposes, and zoned residential. It further emphasized that the club lots' leases prevented them from conducting any commercial business on their properties, further showing that defendant's commercial/residential taxing system was a "factual and legal fiction."

It concluded that because the lots were "like" properties, and because plaintiffs' lots were assessed on a different basis than the lake club lots, defendant had violated the uniformity clause of the Illinois Constitution. It awarded damages to plaintiffs in the amount of the difference between the taxes they had paid and the taxes they would have paid had their land been valued using the same formula that was used to value the recreational club lots.

¶ 24 Defendant filed a motion for reconsideration, which was denied. It then filed an unopposed motion for stay of the judgment pending the outcome of this appeal, which was granted.

¶ 25 This appeal followed.

¶ 26 II. ANALYSIS

¶ 27 Defendant raises multiple arguments on appeal that plaintiffs did not prove their uniformity clause claim in the trial court. Among them is the argument that the lake club lots and plaintiffs' lots were not "like" properties for purposes of taxation, thus defeating a uniformity clause claim. However, we find that, even if we assume the properties were "like," plaintiffs have nevertheless failed to prove a lack of uniformity in taxation.

¶ 28 A. Uniformity Clause

¶ 29 The Illinois Constitution provides that "taxes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law." Ill. Const. 1970, art. IX, § 4(a). "To facilitate the uniformity of taxation compelled by [the Illinois Constitution], the General Assembly has enacted the Property Tax Code [(Code) (35 ILCS 200/1-1 *et seq.* (West 1996))] to govern, *inter alia*, the basis upon which real property is valued for purposes of collecting property tax revenue." *Walsh v. Property Tax Appeal Board*, 181 Ill. 2d 228, 230 (1998). Under the Code, each piece of real property must be valued in general assessment years to determine its FCV, defined as the amount for which a property can be sold in the due

course of business and trade, not under duress, between a willing buyer and a willing seller." *Id.*; 35 ILCS 200/1-50 (West 2024). Each property then receives an assessed valuation based upon 33 ⅓% of its FCV. 35 ILCS 200/9-155 (West 2024).

¶ 30        The uniformity clause requires equality in the burden of taxation. *Walsh*, 181 Ill. 2d at 234. "This, in turn, requires equality of taxation in proportion to the value of the property taxed." *Id.* Accordingly, tax officials may not value "the same kinds of properties within the same taxing boundary *at different proportions of their true value*." (Emphasis added.) *Id.* Additionally, the uniformity requirement of the Illinois Constitution applies not only to uniformity in the level of taxation, but also to the basis for achieving the level. *Id.* at 235. For example, a county may not use different bases for calculating like properties' FCVs where those different bases result in the properties paying taxes on a different percentage of their true value. *Id.* at 236. "The party objecting to an assessment on lack of uniformity grounds bears the burden of proving the disparity by clear and convincing evidence." *Id.* at 234.

¶ 31                                    1. *Standard of Review*

¶ 32        Defendant argues that our standard of review should be *de novo* because, among other reasons, "the trial judge heard no live testimony and ruled only on stipulated facts, deposition transcripts and documentary evidence."

¶ 33        We agree. The only evidence presented at trial was a collection of stipulated documents that included leases between plaintiffs and the City of Springfield, leases between the recreational clubs and the City of Springfield, various tax documents, and transcribed depositions. To the extent we are considering evidence to determine if plaintiffs have established a uniformity clause violation, we stand in the same position as the trial court in relying purely on a written record. Accordingly, we are not compelled to give deference to the trial court's decision and will

review the issue *de novo*. See *Delasky v. Village of Hinsdale*, 109 Ill. App. 3d 976, 980 (1982) (applying a *de novo* standard of review where the evidence in the trial court consisted only of transcripts and exhibits from a prior proceeding).

¶ 34                                    2. *Burden of Proof*

¶ 35            As stated, plaintiffs have the burden of demonstrating a disparity in taxation by clear and convincing evidence. See *Walsh*, 181 Ill. 2d at 234. To prove a disparity in taxation, plaintiffs must prove that their properties and the recreational club properties were each valued at different proportions of their FCVs. See *id.* at 236. However, plaintiffs did not present any evidence of their properties' FCVs or the FCVs of the recreational club properties. As a result, although two different formulas were used to assess the properties, it is impossible to determine if the use of the two different formulas actually resulted in plaintiffs paying taxes on a disproportionate percentage of their properties' FCVs, as is required to show a violation of the uniformity clause. See *id.* While plaintiffs presented testimony that certain assessment officials did not know the basis or rationale behind the use of two different formulas, they did not present testimony that such a rationale did not exist. Indeed, Deaner testified that the two formulas were based on past information regarding sale prices of the properties, as well as the varying uses of the land. He specifically noted it was possible for commercial land to be less valuable than residential land, which would suggest that the use of two different valuation formulas was plausibly related to the respective properties' FCVs. At any rate, by failing to offer evidence of FCV, plaintiffs have failed to prove that they are not.

¶ 36            Plaintiffs rely on *Walsh* for their argument that evidence of FCV is not necessary where it was undisputed that Sangamon County used two different valuation formulas. The dissent agrees with this position. However, we do not.

- 11 -

¶ 37     In *Walsh*, Tazewell County assessed properties by utilizing the " 'mass appraisal method.' " *Id.* at 231. Under this method, rather than viewing the properties to determine their FCV, Tazewell County merely took the average rate of appreciation of properties in the county and multiplied it by a property's previously assessed valuation *Id.* This resulted in Tazewell County properties' assessed valuations bearing little relationship to their FCVs, which the supreme court determined to be in violation of the uniformity clause. *Id.* at 235.

¶ 38     The plaintiffs in *Walsh* were the joint owners of a property named Herget House. *Id.* at 230. Like other properties in Tazewell County, Herget House was valued using the mass appraisal method, which resulted in an assessed valuation far below what it had recently sold for. *Id.* at 232. Other residents complained about the discrepancy between the property's assessed value and its actual FCV, and the Tazewell County Board of Review responded by raising the assessed valuation of Herget House, along with a few other properties, to accurately reflect 33% of the properties' FCVs, as evidenced by recent sales prices. *Id.* The plaintiffs appealed, arguing that the revised assessments violated the uniformity clause. *Id.*

¶ 39     As stated, the supreme court determined that Tazewell County's use of the mass appraisal method violated the uniformity clause because it yielded assessed valuations that bore little relationship to true FCV. *Id.* at 235. However, it went further and held that the Tazewell County Board of Review had also violated the uniformity clause in using the recent sale price of Herget House to calculate its value while continuing to use the mass appraisal method to value other like properties in the area. *Id.* The court explained, "The Illinois Constitution's uniformity clause requires not only uniformity in the level of taxation, but also in the basis for achieving the levels." *Id.* It noted that the uniformity clause's prohibition against taxing properties at different proportions of their true FCV was violated because the use of two different valuation methods

"result[ed] in plaintiffs arbitrarily paying property taxes on a greater percentage of their property's [FCV] than do other property owners." *Id.* at 236.

¶ 40　　　　*Walsh* does not support plaintiffs' position. The court in *Walsh* specifically found that the use of two different appraisal methods violated the uniformity clause because it resulted in plaintiffs paying taxes on a greater portion of their property than other property owners. *Id.* The court was able to definitively find this because it heard evidence of the respective FCVs of both Herget House and the surrounding properties. See *id.* at 232-33. In the instant case, plaintiffs have not provided this necessary information. Accordingly, we cannot say that here, as in *Walsh*, the use of two different formulas resulted in plaintiffs paying taxes on a different portion of their properties' FCVs.

¶ 41　　　　The dissent notes that in *Walsh*, the supreme court found two different violations of the uniformity clause. First, it found that the uniformity clause was violated when Tazewell County used the "mass appraisal method" to value each property. *Id.* at 234. The use of this method resulted in inaccurate valuations, which then resulted in property owners being taxed on different proportions of their properties' actual FCVs. *Id.* In acknowledging this, the dissent acknowledges that inaccurate valuations result in disparate taxation, which results in a uniformity clause violation.

¶ 42　　　　However, the dissent also interprets *Walsh* to find a separate basis for a uniformity clause violation: the use of different valuation methods alone. Notably, the dissent does not argue that the use of different valuation methods violates the uniformity clause *because*, as the court in *Walsh* stated, *inaccurate valuations result in assessed values that are not aligned with true FCV*. See *id.* Instead, the dissent argues that the use of differing methods *itself* is sufficient to constitute a violation.

¶ 43	It is difficult to reconcile this viewpoint with past jurisprudence. As the dissent acknowledges, under the uniformity clause, the issue is not the accuracy of a property's assessment but whether other similar properties are valued "at a substantially lesser or greater proportion *of [their] true value*." (Emphasis added) *Kankakee County Board of Review v. Property Tax Appeal Board*, 131 Ill. 2d 1, 20 (1989). We thus fail to see how a violation of the uniformity clause could be found without knowing each property's true FCV. We agree with the dissent that plaintiffs have shown that, had their properties been valued using the same formula as the recreational club lots, they would have paid less in taxes. However, plaintiffs have not shown that they paid taxes on a larger proportion of their properties' true value than the recreational club lots.

¶ 44	It may always be the case that the use of two different valuation methods on like properties yields an inaccurate FCV as to one or both of the properties and, therefore, a violation of the uniformity clause. But that violation would be found in the *results* of the use of different valuation methods, not the use of the methods. Likewise, it is possible, as plaintiffs argue, that the use of two different formulas here resulted in plaintiffs paying taxes on 33 ⅓% of their properties' FCVs while defendants paid taxes on a different, smaller percentage, or vice versa. However, by merely asserting that two different formulas were used to value the land of each property, plaintiffs have failed to prove this. Therefore, their uniformity clause claim must fail.

¶ 45	B. Overassessment Due to Property Interest

¶ 46	Plaintiffs raise an additional argument in their brief unrelated to a uniformity clause violation. They argue that "[d]efendant improperly assessed the leasehold interests of the plaintiffs as a fee interest rather than a leasehold interest, resulting in gross over[assessments] far greater than the amounts claimed as damages in this case." Plaintiffs suggest that even if we find they have not proven a uniformity clause claim, we can nevertheless affirm the trial court on this basis.

¶ 47        We find that plaintiffs have forfeited this argument. Plaintiffs contend that they raised this issue in the court below, but we disagree. Plaintiffs did not raise this claim in their amended complaint. There, they asserted only that the use of two different formulas to value the lakefront properties violated the uniformity clause. In fact, in that amended complaint, plaintiffs stated that they "wish[ed] to make it as clear as possible in the pleadings that the issue in this case [was] not and ha[d] never been whether assessments of any of the lots referenced in the complaint [were] correct or incorrect or [were] overvalued or undervalued." The only time plaintiffs referenced an argument concerning improper fee interest assessments in the court below was in the posttrial brief they submitted, in which they stated that their lots were overassessed and, therefore, defendant "should be very happy with the money it is getting even under the lower assessment formula." This argument was presented less as a separate ground for the trial court to find in their favor and more of a warning to defendant. Indeed, plaintiffs repeated this admonishment to defendant in their brief on appeal, stating, "[I]nstead of appealing, the Defendant should be very happy with the refunds requested by the Plaintiffs and ordered by [the trial court]."

¶ 48        In short, we find the afterthought references plaintiffs made to this argument to be insufficient where plaintiffs did not present the claim in their amended complaint and instead specifically made clear they were not asserting any claim regarding improper assessments of their properties. Accordingly, we find this issue has been forfeited. See *Grimes v. Sage Telecom Communications, LLC*, 2018 IL App (1st) 171455, ¶ 23.

¶ 49                                III. CONCLUSION

¶ 50        For the reasons stated, we reverse the trial court's judgment.

¶ 51        Reversed.

¶ 52    JUSTICE DOHERTY, dissenting:

- 15 -

¶ 53 The structure of the Illinois Property Tax Code is arcane and can be confusing. It sometimes uses similar words with meanings that might change depending upon the context. Take, for example, the various permutations of the word "assess" in the following sentence: in arriving at an assessment, the assessor must assess the value of property in order to reduce it by one third to reach the assessed value. It is easy to get lost.

¶ 54 My colleagues and I have journeyed through the Code searching for answers to the questions presented here, but we have arrived at different places. In my view, plaintiffs have established that the local taxing authorities utilized a materially different formula in the taxation of plaintiffs' land than was used for similar neighboring properties. I would affirm the trial court's judgment, so I dissent from the majority's disposition.

¶ 55 Though perhaps an oversimplification, we can think of the formula for taxation of non-farm real property in Illinois as having three variables. First, there is the property's "fair cash value," which has consistently been defined as "what the property would bring at a voluntary sale where the owner is ready, willing, and able to sell but not compelled to do so, and the buyer is ready, willing, and able to buy but not forced so to do." (Internal quotation marks omitted.) *Springfield Marine Bank v. Property Tax Appeal Board*, 44 Ill. 2d 428, 430 (1970). "Fair cash value" has the same meaning as "fair market value." *Bloomington Public Schools, District No. 87, McLean County, Illinois. v. Illinois Property Tax Appeal Board*, 379 Ill. App. 3d 387, 389 (2008). Second, there is the assessed value, which by statute constitutes one-third of the fair market value. *Id.* at 390. Third, there is the tax rate, which is essentially the percentage of the assessed value that establishes the actual tax amount to be paid by the property owner.

¶ 56 With this in mind, we must understand where the constitutional requirement of uniformity fits in this scheme.

¶ 57                    Challenge to the Accuracy of an Assessment

¶ 58        The type of tax challenge with which most of us are probably familiar is a challenge to the assessed value ascribed to the property. However, as noted, the assessed value is automatically set as one-third of the first element, the property's fair market value. Consequently, a typical property tax challenge is really all about the *accuracy* of the fair market value determination. Such a challenge will typically involve examination of other market sales of comparable property, often referred to as the sales comparison approach, in order to determine if the subject property has been valued correctly. See *Kraft Foods, Inc., v. Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 43 (discussing various approaches to determine market value). If the determination of fair market value is proven to be too high, the same is also proven as to the one-third assessment value.

¶ 59        In a simple challenge to the accuracy of a property tax assessment, it would be fatal to the property owner to come to the matter without appropriate proof of the property's fair market value. *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 484 (2008). Moreover, the valuation must relate to the whole of the property and not just the land or the improvements, as the two together constitute a "single assessment of the property." *Showplace Theatre Co. v. Property Tax Appeal Board*, 145 Ill. App. 3d 774, 776 (1986).

¶ 60        The foregoing principles are provided primarily to illustrate what is *not* at issue— a challenge to the *accuracy* of an assessment—and to ensure that we do not commingle that analysis with the one needed here. The issue of uniformity stems from a different constitutional guarantee and requires a different type of analysis.

¶ 61                    *Walsh* and the Uniformity Clause

¶ 62         In my view, *Walsh* tells us what we need to know to resolve this case. To understand *Walsh*, it is important to recognize that it discussed two different violations of the requirement of uniformity. First, there was Tazewell County's general use of the "mass appraisal method," which resulted in assessments of properties ranging from 7% to 68% of their true fair cash value. *Walsh*, 181 Ill. 2d at 234. The supreme court held that this "astonishing range of assessed values" itself showed that Tazewell County's mass appraisal method violated the uniformity clause. *Id.*

¶ 63         Still, that is not the particular lesson of *Walsh* relevant here, because the plaintiffs in *Walsh* were not seeking to escape the mass appraisal method, but to have it applied to their own property. The plaintiffs in *Walsh* effectively conceded the *accuracy* of their assessment (based on a recent sale), but they contended that they would have owed less tax under the mass appraisal method used to assess most other properties in the county. The supreme court recognized that the issue under the uniformity clause was more than just the accuracy of the assessment:

> "The plaintiffs *do not contest the fair cash value* ascribed to their property, readily conceding that it is $355,000. Rather, they contend that the Tazewell County board of review has arrived at an assessed valuation of their property on a different basis than that employed for the vast majority of other Pekin Township properties, thus resulting in plaintiffs *arbitrarily* paying property taxes on *a greater percentage of their property's fair cash value than do other property owners*. This violates the uniformity clause prohibition against taxing properties at different proportions of their true fair cash value." (Emphases added.) *Walsh*, 181 Ill. 2d at 236.

Even though the plaintiff in *Walsh* did not challenge the determination of the fair market value of his property, and even though his assessment was "slightly less than 33% of the fair cash value as

evidenced by" its recent sales price (*id.* at 233), he succeeded on his claim that the assessment was not made on a uniform basis.

¶ 64     The foregoing tells us two important things. First, while a challenge to the *accuracy* of the taxing authority's determination of fair market value (or to assessed value, as a derivative) depends upon proof that the value has been determined incorrectly, this is not necessarily required in a uniformity challenge. The supreme court made clear that, even if the assessment is correct on its merits, the "uniformity clause requires not only uniformity in the level of taxation, but also in the basis for achieving the levels." *Id.* at 235. This is why the plaintiff landowners in *Walsh* were not required to present evidence concerning the accuracy or inaccuracy of their own assessments, and it is why plaintiffs here were also not required to do so.

¶ 65     Second, *Walsh* tells us that differences in the *formula* used by the taxing authorities can give rise to a uniformity claim. The constitutional violation in *Walsh* stemmed from the application of a *different* valuation method to the plaintiff's property, and the remedy was to permit his property to be valued under the same flawed mass appraisal method applied to others:

> "Logic and taxation may not be the 'best of friends' (*Sonneborn Brothers v. Cureton*, 262 U.S. 506, 522 *** (1923) (McReynolds, J., concurring)), but until such time as Tazewell County systematically ascribes true fair cash value to all like properties, plaintiffs are entitled to the benefits they have accrued under a uniform, though flawed, basis of valuation." *Id.* at 237.

Under the uniformity clause, then, the issue is not the accuracy of the plaintiff's assessment, but whether other similar properties are valued "at a *substantially lesser or greater proportion* of [their] true value." (Emphasis added.) *Kankakee County Board of Review*, 131 Ill. 2d at 20.

¶ 66                    Application of *Walsh* to This Case

- 19 -

¶ 67        Here, it is clear that plaintiffs modeled their case to follow the path laid out in *Walsh*. First, they put forth evidence that all properties at issue are "like" properties, and I agree with the trial court that they did so successfully:

> "All of the lots in question are located on the main body of the lake, which is the most valuable part according to all of the evidence. All of the lake lots are designated non-farmland for taxation purposes. All lakefront property lots are zoned residential regardless of whether the lot is occupied by a single family home or a recreational club."

¶ 68        Defendant argues that the lots are not similar because different types of leases encumber the different categories of property. However, " '[i]t is clearly the value of the "tract or lot of real property" which is assessed, rather than the value of the interest presently held by the owner.' " *Id.* at 12 (quoting *Springfield Marine Bank*, 44 Ill. 2d at 430-31).

¶ 69        The essence of plaintiffs' case—that the two categories of lots were treated differently in the determination of assessed value—was the easiest for them to prove. Different formulas were explicitly used to assess the land portion of each property's value depending on whether it was categorized as a "residential" or "commercial" property. (The latter descriptor is misleading; all lots in that category are owned by not-for-profit corporations, and perhaps the term "club lot" is more accurate.)

¶ 70        Specifically, lots in both categories had their land value assessed according to square footage; this accounted for the main difference between the lots, *i.e.*, their size. Only the residential lots, however, were subjected to two additional valuation components: the lot's lakefront linear footage and its location. I note that the club lots also had lake frontage and were in the main portion of the lake, but their land value was not increased to account for these factors.

Why would the location of a residential property increase its value, but not the value of the club lot immediately adjacent to it? Why would the degree of lake frontage add to the value of the land in a residential property, but not the land in a club lot?

¶ 71 Defendant takes issue with the examination of only the land component of the assessment, as it might be offset by a higher than usual assessment of the improvements. In other words, as long as the overall assessment ended up in the right place, no harm was caused. While the concept of a "single assessment" is certainly relevant to the question of whether the overall assessment is accurate, that is not the issue here. Instead, in this uniformity challenge, the issue is whether the taxing authorities have applied a non-uniform manner of arriving at the assessment. The taxing authorities cannot embed a non-uniform formula within the calculation of the land value component of the assessment and then complain that only that component is under challenge. It is one thing to suggest that an understated valuation of improvements on a particular lot might offset an overstated valuation of the land, but, here, the defect is baked into the formula adopted by the taxing authorities and applied across multiple lots.

¶ 72 Moreover, while the constitution requires only a "reasonable degree of uniformity" and not "mathematical equality" in the uniformity of the assessment (*Apex Motor Fuel Co. v. Barrett*, 20 Ill. 2d 395, 401 (1960)), plaintiffs here have proven that the differing formulas used to value their properties have led to significant differences in valuation. As compared to the result if the other formula were used, the land component of the assessment of plaintiffs' properties was increased several times over, ranging from 3.66 to 22.65 times higher. On average, use of the residential formula increased plaintiffs' tax bills by $3,454. The evidence plainly shows that plaintiffs suffered significant consequences from the use of a formula different from that applied to the club lots.

¶ 73                    The Need to Avoid Property Classifications

¶ 74         Defendant does not disagree that it lacks the constitutional authority to adopt different classifications of property for the purpose of levying property taxes. See Ill. Const. 1970 art. IX, § 4(b) (permitting only counties with populations in excess of 200,000 to create classifications of real property). Its use of the classifications discussed above can only be justified if they simply serve as a mechanism for accurately computing the actual fair market value of the properties at issue. For example, as a general rule, a house with a garage might be worth more than a house without one; four-bedroom homes might generally be worth more than two-bedroom homes. It would not be unreasonable to formulaically value properties differently based on such factors, and doing so may even promote uniformity.

¶ 75         Here, though, defendant has conspicuously failed to defend the *substance* of the classifications that it has adopted. Defendant has not shown why a residential property's value is affected by the amount of its lake frontage or its location but a club property's is not. The reasons why the formulas at issue were ever adopted are apparently lost to time. This puts defendant in a difficult position to explain why these classifications are earnest mechanisms to accurately ascertain fair market value, as opposed to arbitrary means of treating properties differently. It is not enough to point to differences in the two types of property; defendant must explain why the differences correlate in some way to the elements of the different formulas. This it has failed to do.

¶ 76                                    Conclusion

¶ 77         Taxing authorities in Sangamon County applied one formula for determining the assessed value of some lots on the shores of Lake Springfield and a different one for others. The only real justification for the difference is that this is the way it has always been done, though no

one really knows why it started. Even today, the officials applying the formulas seem incapable of offering a cogent rationale for their differing components. In my view, *Walsh* gives plaintiffs a basis on which to attack the dual scheme and to have their land assessed on the same terms used for neighboring properties. Consequently, I would affirm the trial court's judgment.

¶ 78